## THE BANK OF GILBY *vs.* S. L. FARNSWORTH.

Opinion filed October 21st, 1897.

### Lost Draft—Laches of Drawee—Discharge of Drawer.

A draft drawn by defendant to the order of the plaintiff was lost in transmission by mail from the city where the plaintiff was engaged in business to the city where the drawee resided, to be there presented for payment by the plaintiff's correspondent. Plaintiff failed to discover such loss for nearly six months, although it had in its possession a report from its correspondent which disclosed the fact that the draft had never reached such correspondent. *Held*, that the drawer was discharged from liability.

### Waiver of Right to Release.

When a drawer who has been discharged because of the failure to take the necessary steps to charge him, promises to pay the draft or recognizes his liability thereon, with full knowledge of the facts releasing him from liability, he thereby waives his right to insist that he has been released.

### Duplicate Draft—Evidence of Purpose in Giving it.

The giving by the drawer of a duplicate of the lost draft does not necessarily evince a purpose to waive such defense. Such duplicate does not, as a matter of law, import a promise to pay the draft. Therefore it is competent to show by parole evidence that the drawer informed the payee that he did not intend by the giving thereof to waive his rights, but merely to accommodate the payee by putting in his hands a paper which would enable him to collect the money from the drawee.

### Duplicate Not a New Contract—Varying Written Contract.

Such evidence does not contradict or vary the terms of the written contract between the parties, for there is only one contract between them,—*i. e.* the original draft,—the duplicate adding nothing to the liability of the drawer, and not constituting a new or additional contract.

Appeal from District Court, Grand Forks County; *Fisk*, J.

Action by the Bank of Gilby against S. L. Farnsworth. Judgment for defendant. Plaintiff appeals.

Affirmed.

*J. B. Wineman* and *Charles F. Templeton*, for appellant.

The failure of plaintiff to present the original bill was caused by circumstances over which it had no control, and his failure to present it is thereby excused. Section 4944, Rev. Codes; *Windham Bank* v. *Norton*, 22 Conn. 213; *Pier* v. *Heinrichsoffen*, 67 Mo.

163; *Brown* v. *Olmstead*, 50 Cal. 162. The drawing of the dupli-
cate draft and delivery of it to plaintiff, was a waiver by defend-
ant of the defense of laches. *Leonard* v. *Hastings*, 9 Cal. 236;
*Martin* v. *Lennon*, 19 Minn. 74. The duplicate draft constituted
a promise by defendant to pay the amount specified therein. An
admission of liability or promise to pay after notice of facts con-
stituting a release waives the defense of laches. *Thornton* v.
*Wynn*, 12 Wheat. 183; *Sigerson* v. *Matthews*, 20 How. 496; *Yeager*
v. *Farwell*, 13 Wall. 6; *Parsons* v. *Dickinson*, 23 Mich. 56; *Ladd* v.
*Kenny*, 9 Am. Dec. 77; *Meyer* v. *Hibsher*, 47 N. Y. 265; *Ross* v.
*Hurd*, 71 N. Y. 14; *Cady* v. *Bradshaw*, 116 N. Y. 188; *Tibbetts* v.
*Dowd*, 23 Wend. 379; *Third Nat. Bank* v. *Ashworth*, 105 Mass.
503; *Rudge* v. *Kimball*, 124 Mass. 209; *Hobbs* v. *Straine*, 149
Mass. 212; Mayers Appeal, 87 Pa. St. 129; *Oxnard* v. *Varnum*, 111
Pa. St. 193; *First Nat. Bank* v. *Bonner*, 27 S. W. Rep. 699; *State
Bank* v. *Bartlett*, 21 S. W. Rep. 816; *Curtis* v. *Sprague*, 51 Cal. 239;
*Knapp* v. *Runals*, 37 Wis. 135; Daniels Neg. Inst. § 1147. No new
consideration was necessary to support the waiver. *Sheldon* v.
*Horton*, 43 N. Y. 93; *Matthews* v. *Allen*, 16 Gray 594; *Lockwood* v.
*Bock*, 50 Minn. 142. All evidence relating to a conditional
delivery of this new draft for showing prior or contemporaneous
stipulations was incompetent. *Cowel* v. *Anderson*, 33 Minn. 374;
*Harrison* v. *Morrison*, 39 Minn. 319; *Farwell* v. *St. Paul Trust Co.*,
45 Minn. 495; *Youngberg* v. *Nelson*, 51 Minn. 172; *Burke* v. *Ward*,
32 S. W. Rep. 1047; *National Ger. Am. Bank* v. *Lang*, 2 N. D. 66;
*Kulenkamp* v. *Groff*, 40 N. W. Rep. 57; *Thompson* v. *McKee*, 37
N. W. Rep. 367; § 3888, Rev. Codes; *Brown* v. *Spafford*, 5 Otto,
374; *Martin* v. *Cole*, 14 Otto, 30. Notwithstanding the opinion in
*Garr, Scott & Co.* v. *Green*, 6 N. D. 48; A written instrument
cannot be conditionally delivered. Sections 3889, 3890 and 3517,
Rev. Codes. The cashier of plaintiff could not bind it by any
stipulation that defendant should not be held according to the
legal effect of the writing. *Thompson* v. *McKee*, 5 Dak. 172.

*Cochrane & Feetham*, for respondent.

The loss of a bill or note is no excuse for want of demand,

protest, or notice, because it does not change the contract of the parties.    The drawer and indorsers are at once discharged if there is a failure in respect to either demand, protest or notice. Daniels on Neg. Insts. 1464.   The duplicate was not an original contract.   It was made as a substitute for and to take the place of the original, and no new liability of the defendant was thereby created.   *Benton* v. *Martin*, 50 N. Y. 347.   There was no consideration for the new or duplicate draft.   Rand Com. Paper, 1693. The evidence of statements made at the time of delivering the duplicate draft, and explaining the delivery was competent. *Warroll* v. *Munn*, 5 N. Y. 229; *Braman* v. *Bingham*, 26 N. Y. 483.

CORLISS, C. J.   The plaintiff by this action is seeking to hold the defendant liable as drawer of a draft.   The plaintiff is the payee named in such draft, and it was drawn on J. M. Gagen & Co., of Grand Forks City, the defendant being a resident of Gilby, N. D.   Defendant had been engaged in buying wheat for J. M. Gagen & Co., for some time previous to the day when this draft was drawn.   It was his custom to advance the money with which to make all purchases of wheat for his principal, and at the close of the day to draw upon them a draft through the plaintiff, a state bank at Gilby, to reimburse him for such advances.   On the 26th of September, 1895, the moneys he had that day expended in buying wheat for his principal amounted at the close thereof to the sum of $612, and on that day he drew upon them, through the Gilby Bank, for that amount; that bank cashing the draft, as was its custom.   The draft was lost in transmission by mail from Gilby to Grand Forks, it being forwarded by plaintiff to the First National Bank of Grand Forks for collection.   The fact of such loss was not discovered by plaintiff until the latter part of March, 1896, or nearly, if not quite, six months afterwards. As soon as plaintiff learned that the draft had not been received by its agent, the First National Bank of Grand Forks, it notified the defendant, and requested him to give a duplicate thereof. Defendant refused so to do until he had ascertained whether the draft had in fact not been paid.   Subsequently he signed and

delivered to plaintiff an exact duplicate of the lost draft, it being dated as of the 26th of September, 1895, the same as the original. Written upon the draft in two places was the word "Duplicate." Defendant testified, and his evidence was confirmed by that of his son, that he distinctly informed the plaintiff that he knew that he had been discharged from liability on the lost draft by reason of the negligence of the plaintiff, and that he did not intend, by the giving of the duplicate, to reinstate such liability. The evidence on this point is somewhat conflicting, but the learned trial judge, having all except one of the witnesses before him, found in favor of the defendant on this point. In a case where the evidence is so evenly balanced, we should not overthrow a finding of fact which necessarily rests in part upon a knowledge of the demeanor and appearance of witnesses which we do not and cannot possess. That the defendant was discharged from liability as drawer does not admit of doubt. Under the statute it was the duty of the plaintiff to present the bill for payment within 10 days after the time in which it could, with reasonable diligence, forward it to Grand Forks for such presentation. The draft was payable on demand, and did not draw interest. Our statute declares that, "if a bill of exchange payable at sight or on demand without interest is not duly presented for payment within ten days after the time in which it could with reasonable diligence be transmitted to the proper place for such presentment, the drawer and indorsers are exonerated, unless such presentment is excused." Rev. Codes, § 4941. Nor does the loss of the paper exonerate the plaintiff from the performance of this duty, which it owed the defendant, "The loss of a bill or note is no excuse for want of a demand, protest, or notice, because it does not change the contract of the parties, and the drawer and indorsers will be at once discharge if there be failure in respect of either the demand, protest, or notice. This rule applies whether the bill has been accepted or not, for the loss of the instrument does not relax the duty of the holder to make the demand for acceptance within due season." 2 Daniel, Neg. Inst.

§ 1464. It is possible that the time during which plaintiff remained in ignorance of the fact of such loss, without being chargeable with negligence, was not a part of the time mentioned in the statute. Probably § 4909, Rev. Codes, covers such a case. This section reads: "Delay in presentment or in giving notice of dishonor is excused when caused by circumstances which the party delaying could not have avoided by the exercise of reasonable care and diligence." It may be that the holder of a draft is not responsible for the carelessness of public servants in the carrying of the mails, and therefore that he does not take the risk of such carelessness. But the moment the exercise of reasonable diligence requires him to know the fact that the paper has been lost, he must then proceed under the statute to make the demand of payment, and give notice of dishonor. This duty the section referred to clearly recognizes. It is only when the delay is caused by circumstances which the party delaying could not have avoided by the exercise of reasonable care and diligence that he is excused. It is a mild form of expression to speak of the negligence of the plaintiff in failing to discover for six months the fact that this draft had never been paid, and had not even reached its correspondent and agent, the First National Bank of Grand Forks. Nearly six months intervened between the mailing of the draft and the discovery of its loss, during about five months of which time plaintiff's cashier admits that there was in his possession a statement from the First National Bank which would have disclosed the fact that that bank had never received the paper. From the standpoint of the defendant's rights and interests, the plaintiff was guilty of gross and inexcusable negligence; and defendant was thereby discharged from all liability on the paper. But it is urged that to allow the defendant to prove the oral understanding between him and the plaintiff's cashier at the time of the delivery of the duplicate draft is to contradict by parol evidence the terms of a written instrument. This contention must find support, if at all, in the postulate that the duplicate draft was an independent contract, creating an addi-

tional liability. This position is not tenable. All the evidence in the case, the duplicate itself, and the plaintiff's own pleading, speak but one language regarding the paper. It is not a new agreement, but merely a written evidence of the lost instrument executed to take its place. After a contract is duly entered into the making of a duplicate adds nothing to the liability of any of the parties to the agreement. There is still only one contract, although, for convenience of the parties, there may be two, or even more, original agreements, each the exact copy of all the others. Burrill defines a duplicate as "an original instrument repeated; a document which is the same as another in all essential particulars, and differing from a mere copy in having all the validity of an original." It is immaterial when a duplicate is executed. If it is in fact a duplicate, it adds no more to the obligations and rights of the parties to the agreement, when it is executed at a subsequent date, than when its execution is contemperaneous with that of the other duplicate. Suppose that the defendant had been properly charged as drawee, and that thereafter the draft had been lost, would it be claimed that the execution by defendant of a duplicate under those circumstances would have added anything to his liability, or that the duplicate would have been a new and distinct contract? Clearly not; otherwise he would then be liable for twice the sum which he had. The mere fact that the duplicate was executed after he had been discharged cannot make it a separate and independent agreement, although the execution thereof might, under some circumstances, be cogent evidence that the drawer had intended to admit his liability, and thus, under a familiar rule, waive his discharge. That, however, is another question having no connection whatever with the inquiry whether the defendant, by signing and delivering this duplicate as a duplicate, and as a dulicate only, has nevertheless entered into a new contract creating a distinct liability. That no new agreement was made by the execution of this duplicate cannot admit of doubt. All that was done was to furnish the plaintiff with a copy of the

lost paper; a copy, however, which has all the force (and no more) of the original, because signed by the defendant, the same as this old draft. Therefore the defendant's evidence that he stated, before signing the duplicate, that he did not thereby intend to add anything to his liability, was in harmony with the very nature of the act of executing a duplicate, and not in conflict therewith. His evidence was not incompetent on the ground that it tended to contradict or vary the terms of a written agreement. Clearly, his evidence that he informed the plaintiff before the delivery of the duplicate that he knew that he had been released from liability, and did not intend to yield his vantage ground by the execution of such duplicate, was not evidence which in any manner varied or contradicted the terms of the only contract between the parties. That contract was the original draft. By signing the duplicate, the defendant, as we have before stated, did not make a new agreement, or add anything to the old. He merely gave another written evidence thereof. Therefore the only contract between the parties whose terms can be varied by the oral evidence in the case is the draft drawn September 26, 1895. But defendant does not seek to add to or take from this agreement one *iota*. He concedes that it is a fair contract, and that it means just what the law says it means. But he asserts that the condition on which the liability thereunder was to become absolute has not been fulfilled, and that, therefore, he has been released as drawer of the draft. What he sought to prove was, not that the original draft was delivered on condition, or did not represent the real intent of the parties thereto, but that, by giving a duplicate, he did not intend to waive his right to insist that he had been exonerated from liability by the laches of the plaintiff.

Counsel for plaintiff treats the duplicate as a new contract, and then reasons that it imports an absolute liability on the part of the defendant, provided the proper steps were taken to charge him as drawer. Here is the fallacy of his reasoning. The postulate is false. It is no more a distinct contract than it would have

been had it been executed at the same time that the lost paper was executed. As a new contract it would have no consideration to support it. It is undisputed that no money was paid for the duplicate by the plaintiff. Nor was defendant under any moral, much less any legal, obigation to give it. He had been discharged through the gross carelessness of plaintiff; and the circumstances of the case show that, if the bank had acted with ordinary diligence, the loss of the draft would have been discovered in ample time to insure the collection of the money from J. M. Gagen & Co., as it is uncontradicted that between the time it was given and their suspension of business through insolvency they paid 74 drafts drawn on them by defendant. There might have rested upon defendant a certain business obligation to accommodate the bank by giving to it some written evidence that the bank was entitled to $612 of the funds of the defendant in the hands of J. M. Gagen & Co. But neither legally nor morally was defendant bound to pay a dollar, or in any manner help the plaintiff, by again becoming responsible; out of the dilemma in which it had placed itself by its own inexcusable negligence. If, therefore, we could treat this duplicate as an independent contract, it would be void as between the parties for want of a consideration to support it. But it is idle to talk of its being a new contract. The whole trend of the evidence, the writing of the word "Duplicate" on the paper itself, and the solemn averments of the plaintiff's own pleading, all point to one conclusion; *i. e.* that all that the parties intended was to make a duplicate of a draft which had theretofore been executed, and delivered by defendant to plaintiff. Plaintiff, in its complaint, avers "that on the 1st day of April, A. D. 1892, the defendant executed and delivered to the plaintiff a duplicate of said bill of exchange for the purpose of presenting the same to said J. M. Gagen & Co., and collecting from said J. M. Gagen & Co. the said sum of $612." We must, if we are not to lose ourselves in a labyrinth, take this duplicate, and assume it to have been executed as of the date of the lost draft, in considering the question whether there has been

an attempt on the part of the defendant to contradict or vary by parole evidence the terms of a written agreement. But what effect the execution of this paper has to restore the liability of the defendant as drawer is another question, which must be discussed entirely separate from the question of parol evidence. On this branch of the case the time when the duplicate was executed is very important. If it had been signed when the lost draft was signed, no one would contend that it was any evidence of waiver. But, as it appears to have been executed at a time when the defendant knew that he had been released as drawer, there might be a possibility of claiming that he thereby intended to admit his liability despite the fact that he had been discharged. If the paper were a note, and the defendant were an indorser thereon, his indorsing of a duplicate would be strong, perhaps conclusive evidence, that he intended thereby to admit his liability, although he had been discharged. In such a case there would be no other plausible explanation of his conduct. But in the case at bar there was a sufficient reason why the plaintiff should desire, and the defendant be willing to give, a duplicate, aside from a purpose to re-establish an extinguished liability. It was necessary that plaintiff should have some written authority from defendant to enable it to collect from J. M. Gagen & Co. $612 of the funds of defendant in their hands. For this purpose a duplicate was a very natural paper to give, for it would keep the records of all the parties in proper business shape. An order or an assignment would have been sufficient to enable the plaintiff to collect from J. M. Gagen & Co. the $612, but a duplicate of the original draft was the most natural document for the parties to select to effectuate this object. It was entirely competent for the defendant, at the time of giving it, to notify the plaintiff that he did not intend by the giving of such duplicate to waive his rights, but that his sole object was to put the plaintiff in shape to secure its money from J. M. Gagen & Co. According to his evidence, it was solely for this purpose that the plaintiff asked for the duplicate. It is possible that in this case the inference might be

drawn from the bare fact of giving a duplicate under the circumstances of this case that defendant intended to abandon his defense that he had been released. But this would not be on account of the terms of the paper, or of its legal effect. Nor would it follow as a legal conclusion from the giving of a duplicate. That would be merely a circumstance having certain probative force, and evidence to overthrow the inference would be competent. Such evidence would only go to show that what on the face of the transaction was presumably the intention of the defendant was not in fact his intention, and that the plaintiff knew that it was not. Unless a duplicate draft, as a matter of law, constitutes a promise to pay despite the release of the drawer,—unless this is the legal effect of such an instrument,— the parol evidence did not in any manner contradict or vary its terms. Now, it is obvious that a draft does not contain any promise by the drawer to be bound despite a prior discharge, for at the time it is given the drawer is never released. And the duplicate draft is not a new contract, but another copy of the original, signed like the original by the drawer. As a contract it imports nothing more than the original draft. As evidence of a purpose to waive a discharge it will have such force as other evidence and other circumstances in the case permit, and no other or different force. And proof of other facts bearing upon the question of waiver in no manner affects the terms or legal effect of the only contract between the parties; *i. e.* the original draft, which has been lost. The decision of the New York court of appeals in *Benton* v. *Martin*, 40 N. Y. 345; *Id.*, 52 N. Y. 570, is a direct authority in support of our decision. It is true that, when the case was before the court of appeals the last time (52 N. Y. 570,) Judge Folger appears to have thought that the doctrine that it is competent to prove that a written instrument was delivered conditionally had some bearing on the case, and it may be doubtful, in view of our statutes, whether that doctrine prevails in this state. See Rev. Codes, § § 3517, 3889, 3890. But no such foundation for the decision was stated by the

court in the decision in 40 N. Y. 345. Nor can we per-
ceive how it is possible to talk about the conditional delivery
of a mere duplicate of an actually delivered and perfectly
valid contract, one which had previously taken effect without
condition. The delivery in that case was not conditional in the
sense of the doctrine referred to, or, indeed, in any sense what-
soever. The drawer of the draft in that case merely asserted that,
while he recognized the fact that he had once been liable on a
draft issued by him, and which had theretofore been delivered
unconditionally, and while he was willing to give the payee a
duplicate to enable it to obtain its money from the drawee, yet he
wished it understood that he did not intend to have his act of
accomodation construed as a recognition of the very liability
from which he had been, by the payee's carelessness, released.
Here was no condition, but merely a refusal to have his act, which
was not necessarily an admission of liability, construed as such
an admission. The duplicate was not delivered as a contract.
The delivery of the contract had already taken place months
before. How can it be said that any question of condi-
tional delivery is involved in a case of this kind? What was
done in that case and in this was not the delivering of a contract,
thus for the first time making it effectual, but the furnishing of a
duplicate of a contract which had been unconditionally delivered
some time before. Such a thing as the conditional delivery
of a duplicate, the contract already having taken effect by
an unqualified delivery, is an utter impossibility. The defendant
attached no condition to the delivery of the duplicate. He merely
guarded against the possibility of having his act in so doing
construed as a recognition of liability, and hence, under the
authorities, as a waiver of his discharge. Certainly, the furnish-
ing of a duplicate of a lost draft is an act susceptible of two
different constructions. It may indicate a purpose to reinstate
an extinguished liability, or it may be an act of accomodation to
the payee to enable him to obtain the funds of the drawee in the
hands of the drawer from such drawee, the payee being equitably

entitled thereto. Surely, evidence which throws light on this ambiguous transaction should not be excluded, nor is there any rule of law requiring this to be done. Had the defendant in express terms promised in writing to pay the draft, then it might be claimed that parol evidence tending to show that he did not mean what he said would fall within the rule excluding parol evidence to contradict a written instrument. But no such promise is found on the face of the duplicate, nor is one necessarily implied by the law. Whether such a promise was intended to be made,—whether it has, in fact, been made,—is to be gathered from all the circumstances of the case; and no act indecisive in character can control to the exclusion of other equally good, or rather more satisfactory and explicit, evidence. It is unjustifiable to force upon the defendant an intention to yield up his defense merely because he gave the plaintiff a copy of the original draft, when such act could be and was in fact an act of pure accommodation to the plaintiff. It must be kept in mind that it does not take a contract to reinstate an extinguished liability of this character. No new consideration is necessary. No agreement on the part of the other party (the creditor) is essential. All that is needed is that the drawer should manifest a purpose to be bound notwithstanding the fact that the holder has failed to charge him as drawer. 2 Daniel, Neg. Inst. § § 1147, 1147a, and cases cited. How, then, has the doctrine relating to parol evidence any bearing on the question whether the drawer has in fact evinced a purpose to surrender his impregnable position? It is urged that the cashier of the bank had no power to bind it by agreeing that the delivery of the duplicate should not constitute a waiver of the drawer's defense. It is certainly remarkable if a principal can in this way force upon a party an agreement or waiver he never intended. Want of power in the agent will entitle the principal to claim that he is not bound. But it has remained for counsel for the plaintiff to discover that it likewise enables the principal to insist that another who has

dealt with the agent has made a contract to which he (such other party) has never assented, or has in law agreed to a waiver which he has expressly guarded against. When defendent and plaintiff's cashier came together, defendant had been relieved from all liability to the plaintiff; and whatever rights the plaintiff has obtained have accrued to it through the dealing of the defendant with such cashier. It can take only such rights as the defendant has seen fit to confer upon it. Claiming the benefit of this arrangement, it must take with it all its conditions. As the defendant declared to the cashier that he would not waive his discharge, the plaintiff cannot, on account of any want of power in the agent, transmute this refusal to waive into a waiver in fact. As the defendant was discharged from liability, and as he has not waived his right to rely on such discharge, the judgment of the District Court in his favor must be affirmed. All concur.